**NEFF, Plaintiff, v. PALMER et, Defendants.**

Common Pleas Court, Fayette County.

No. 21649. Decided January 24, 1956.

Charles S. Hire, Washington C. H., for plaintiff.
W. S. Paxson, Washington C. H., for defendants.

## OPINION

By CASE, J.

This is an action for malicious prosecution. In his petition the plaintiff complains that defendant, Robert C. Palmer, falsely, maliciously, and without reason or probable cause charged plaintiff, in the Municipal Court of the City of Washington, with having committed the offense of carrying about his person a dangerous weapon; that said defendant caused a warrant to be issued for the arrest of plaintiff and did arrest plaintiff under said warrant; that plaintiff was imprisoned for three

hours, and to secure his release was compelled to give bond; that, at the trial on July 15, 1953, plaintiff was acquitted; and plaintiff's petition further recites in part as follows:

"* * * that said charge, arrest and trial, was reported by the newspaper of said city; that by reason thereof said plaintiff has been greatly injured in his credit and reputation; that he incurred an expense of Fifty Dollars, ($50.00) for counsel fees in defending himself; and that by reason of the facts herein set forth said plaintiff has been and now is damaged in the sum of Five Thousand Dollars ($5,000.00)."

The answer of defendants filed herein reads as follows:

"Defendants for answer to plaintiff's petition admit that defendant, The Ohio Casualty Insurance Company, is a corporation organized under the laws of the State of Ohio, authorized to do a general surety business within said state; that on the 13th day of July 1953, the defendant, Robert C. Palmer, was a policeman and patrolman of the city of Washington, Fayette County, Ohio; that on the 25th day of August, 1950 said defendant, Robert C. Palmer, gave a bond in the sum of $1,000.00 with said defendant, The Ohio Casualty Insurance Company, as surety thereon, which was approved by the City Manager of said city, which bond was conditioned that said Robert C. Palmer would well, truly, and faithfully perform all official duties required of him by law. Defendants further admit that on July 13, 1953 said defendant, Robert C. Palmer, in his official capacity as said policeman and patrolman signed an affidavit in the Municipal Court of said city charging said Richard Lee Neff with carrying a concealed weapon, and that a warrant was issued for the arrest of said Richard Lee Neff under which said Richard Lee Neff, plaintiff herein, was arrested and was required to give a bond; that at the trial of said cause on or about July 15, 1953 before the Court said Richard Lee Neff was found not guilty and said cause was thereby ended. Defendants deny each and every other allegation contained in said petition not herein expressly admitted to be true.

WHEREFORE, defendants pray that plaintiff's petition be dismissed and that they may go hence without day."

By agreement of counsel for the respective parties, said cause herein was tried to this court without a jury; and by reason thereof this court has a duty to adjudicate and determine all questions of fact as well as all questions of law raised by the issues joined in this case.

As a matter of law, this court must assume the truth of all facts admitted and set forth in defendants' answer and must consider and determine all reasonable inferences to be derived therefrom.

In addition to those facts so admitted by defendants' answer, the court finds, from all of the testimony presented at the trial of this cause, that the following facts are undisputed and sufficiently established by credible testimony of record herein:

1. That, on July 13, 1953, plaintiff was regularly employed by Donald Moore, owner and operator of a fruit and vegetable business in said city, and had been engaged in such regular employment for said employer and his predecessor for approximately two years;

2. That plaintiff's earnings from such employment ranged from $65

to $140 per week depending upon the frequency and nature of trucking-trips made by plaintiff to points outside of Ohio for the purpose of purchasing and returning with fruits and vegetables for said employer's business;

3. That, when engaged in operating said employer's truck on such trucking-trips, the plaintiff carried with him various amounts of cash ranging from $70 to $2,000 with which to purchase such commodities for his employer, except on one such trip when plaintiff carried a check to cover the cost thereof;

4. That, on such trucking-trips, plaintiff carried a revolver on said truck for the protection of his person and said property;

5. That, on July 13, 1953, plaintiff was scheduled to make such a trip to the State of Florida;

6. That, on the morning of July 13, 1953, plaintiff had fired said gun in shooting at some birds on a farm in Fayette County;

7. That, at approximately 3:00 P. M. on July 13, 1953, plaintiff was carrying said firearm in his Hudson automobile on that portion of the floor immediately adjacent to the front of the front-seat thereof when he reported for work at his employer's place of business;

8. That, immediately following his arrival at said place of employment, plaintiff's automobile was involved in a minor collision with another automobile thereat;

9. That, without removing said firearm therefrom, plaintiff immediately reported said collision to the city Police Headquarters by telephone from said place of employment;

10. That, as a result of said report, the defendant, Robert C. Palmer, was assigned to make an investigation of said collision and arrived at the scene thereof within approximately 10 minutes after plaintiff had reported same;

11. That, after interviewing plaintiff at the scene of said collision, said defendant proceeded to check the brakes of plaintiff's automobile by depressing the brake pedal thereof and while so engaged observed said firearm on the floor thereof;

12. That said police officer forthwith took possession of said firearm;

13. That, while said police officer was so engaged in depressing said brake pedal and taking possession of said firearm, plaintiff was engaged in answering a telephone call from the inside of said place of business and while so engaged was in a position to observe and did observe defendant Palmer engaged in the acts of depressing said brake pedal and taking possession of said firearm;

14. That, thereupon, plaintiff forthwith terminated said telephone conversation; returned to his automobile; asked of the officer where defendant was going with plaintiff's firearm; admitted said firearm had been placed in said automobile by plaintiff; and that said firearm had been fired that morning by plaintiff;

15. That defendant Palmer forthwith took plaintiff into custody and removed him to police headquarters where plaintiff was detained, although not placed in a cell, for approximately two and one-half hours;

16. That, during said period of detention, defendant Palmer con-

sulted with his superior, Capt. Haggard of the Police Department, and the City Solicitor, Mr. Junk, concerning the statutory provisions relating to carrying concealed weapons and what form of affidavit defendant Palmer could use in filing such a charge;

17. That, during said period of custody and detention, plaintiff explained to said defendant the circumstances under which plaintiff had been carrying said firearm;

18. That, during said period of custody and detention, the plaintiff's employer consulted with and explained to said defendant the circumstances under which the plaintiff had been carrying said firearm;

19. That, during said period of custody and detention, the plaintiff's father consulted with and explained to said defendant the circumstances under which the plaintiff had been carrying said firearm;

20. That defendant Palmer did not report to said City Solicitor those circumstances so related to defendant Palmer by the plaintiff, the plaintiff's employer, and the plaintiff's father;

21. That defendant Palmer did not make any investigation about the character of plaintiff before filing said affidavit;

22. That defendant did not make any investigation as to whether or not plaintiff had ever been charged with any offense;

23. That defendant Palmer did not make any investigation as to whether plaintiff had any record with the Sheriff of Fayette County; and

24. That defendant Palmer had never seen and did not know the plaintiff prior to July 13, 1953.

The burden of proof in this case rests upon the plaintiff to show and establish by competent and sufficient evidence that defendant Palmer instituted and prosecuted said charge maliciously and without probable cause, and that by reason thereof plaintiff sustained one or more of the items of damage claimed and set forth in plaintiff's petition. In other words, the elements of an action for malicious prosecution are malice, absence of probable cause, and damage.

In 25 O. Jur., 890, Sec. 20, it is stated in part as follows:

"The malice required to sustain an action for malicious prosecution may be either express or implied; that is, malice may be inferred from the circumstances of the case. * * *"

"It is a general rule that if want of probable cause is shown, the legal inference may be drawn that the proceedings were actuated by malice. But, although malice may be inferred from want of probable cause, it does not necessarily follow. There may be want of probable cause, without malice. The jury may, under certain circumstances, find the existence of malice from want of probable cause, but it does not always follows as a legal inference."

In Bader v. Miles, 19 Abs 113, at page 116, Oh Ap, 2nd Dist, Montgomery Co., which is also the court of appeals for Fayette County, the following portion of a charge to a jury was cited with approval:

" 'Now, an essential element in a case of malicious prosecution is malice. Malice in law is not strangely different from malice in life, and yet there are two aspects of malice recognized by the law. Malice in

legal contemplation is that state of mind in which a person acts with disregard and a lack of consideration for the rights of others, and then in addition to that there is actual malice, that is, that state of mind dictated by hatred or ill will or a spirit of revenge or retaliation. The court might say that one is legal malice, that is, malice taken from the facts of the case indicating that a person acts in disregard of the ordinary and just rights of another. And the second, actual malice, that he acted through a spirit of hatred or ill will or determination to vent his feelings upon the other person. The burden is on the plaintiff to prove in this case that the prosecution initiated by this defendant was occasioned by malice.

"* * *

" 'It is not necessary that the plaintiff shall prove the exact shade of feelings, but he must establish that the act complained of was actuated either by malice, express or implied, actual or legal malice.' "

It is undisputed that defendant Palmer did not know and had not seen plaintiff prior to the events of the afternoon of July 13, 1953. Therefore, it is reasonable to conclude that there was no actual malice on the part of defendant Palmer arising out of or existing by reason of any previous acquaintance, conduct or meeting between defendant Palmer and plaintiff; and the court so finds.

With regard to actions and conduct between these parties during the time defendant Palmer interviewed plaintiff at the scene of the auto collision and before said defendant checked the brakes of plaintiff's automobile and took possession of the revolver found therein, the evidence is clear and undisputed that their respective conduct toward each other was devoid of any acts which could or would indicate or tend to show any malice of either toward the other; and the court so finds.

On the other hand, beginning at the time defendant Palmer picked up the revolver from the floor of plaintiff's automobile on July 13, 1953, and continuing to the time plaintiff was released from said charge by the Municipal Court on July 15, 1953, there followed a series of incidents concerning which there is conflicting testimony respecting the attitude and conduct of these parties toward each other which could indicate or tend to show such malice as is required to sustain an action for malicious prosecution.

Beginning at page 40 of the Record, defendant Palmer testified in part as follows:

"* * * I checked the brakes on Mr. Neff's car and in the process of reaching in to check the brakes I found the gun under the front seat where it overlapped, and I had a large stiff back board which was attached the accident report—I had that in one hand and by pencil and when I found this gun, I took it out of the car, Mr. Neff spoke or hollered loud enough for me to hear 'am I stealing his gun, or words to that effect, and I held it up' and said 'is this your gun' and he said 'yes.' I said 'Mr. Neff, I have no intention of stealing your gun, but I am going to take the gun and you down to headquarters.' 'Here you have a gun that has been recently fired' and he said 'we have been out on the farm shooting birds.' I said 'Mr. Neff you must be a pretty good shot to shoot birds with a two inch barrel.' Most of the men can't hit a door at fifty

feet, let alone a bird. I did take him down to the police station and I gave the Captain a resume of what happened and under what circumstances the gun was found.

"MR. HIRE: It was in his presence?

"Yes. I gave the Captain a resume and my reason for inquiring further in the matter as Mr. Neff having the gun. To give him the benefit of the doubt, I call the city Solicitor—told him that I recently found the gun. Evidently, he didn't know the boy personally, and I told him I didn't know him, and that he may not have had criminal intent. I wanted his advice as to whether or not under these conditions it would be proper to file a complaint and he said he would call me back in fifteen minutes, and advise me. At that time Mr. Neff did not give me any reason as to his carrying the gun at that time. The only thing that he said that he had been out shooting blackbirds with a two inch revolver. Later in the conversation, I learned that he worked for Donald Moore and that he drove a truck for him and when he drove a truck he had considerable money on him. He did not give any excuse for having it in the car at that time.

"Q: Now, Robert you said you gave Captain Haggard a resume of what had taken place. Just tell the Judge what you told Captain Haggard?

"A: Well, I told him that I checked this accident and that when I was checking the brakes, I found a loaded gun concealed under the seat. I told him that it didn't look right for the boy to have the gun under those conditions. I said, you can see the gun has been recently fired. I told him that, and he said he would like to look at this section of law pertaining to these things, and see how you would interpret it. He did and I said I am also going to call the city solicitor just to be sure. He said as far as my part is concerned its right. I said I wanted to do it according to the law. That is all. The Captain did look in the book and told me that as he saw it, Mr. Neff is in violation.

"* * *

"After the Captain told me that—well, I said 'you have been here longer than I have, I suppose you are right, but I remember sometime during my schooling you had to prove criminal intent or criminal intent had to be present, and I said for that reason, I wanted to call the city solicitor and give him the statement of facts' and the captain said there was nothing wrong with that so I did. I called Mr. Junk and told him the circumstances and also phrased this question as to criminal intent to Mr. Junk, and he told me under a certain section of law that there is a cause for a complaint to be filed. I asked him what form to use and he advised me as to that.

"Q: Now, Mr. Palmer, you stated that you told him the circumstances —can you tell what the circumstances were?

"A: I told Mr. Junk about the accident and accidently finding the gun. I said he had an accident and while I was checking the brakes I reached in and pushed the brake and I saw this stub nose revolver. I said he had a young boy with him and he said they were shooting crows with this gun—the gun has just been fired and to me it didn't

seem just right. Well, I stated the facts and he called me back in about fifteen minutes and told me that as far as he saw it, it was a charge of carrying concealed weapons and advised me as to the form to use. After that was done, this Mr. Moore came up and told me that he worked for him and carried that gun with him on the trips that he made. Be that as it may, that has no bearing who he works for and later on his father came up, business man in town and he was concerned over his son's reputation. Well, I said 'Mr. Neff with all respects to you and your family, I remind you that I am a police officer and if any publicity arises, it will arise from the Record-Herald. I do not have any control over the Record-Herald. These records are public. The bond—the captain also set the amount—he said it should be $500. Mr. Neff wanted to give a check for that amount. Now it is a plainly written law—He wanted to give a check for the bond and I refused it. Those were my instructions not to take a check. Therefore, I couldn't accept a check. About that time the chief of police came through the office and he agreed to reduce the bond to $200 and it was reduced to that amount. Approximately that, and Mr. Neff was released and left.

"Q: Now, Robert, during the time you were there at the police station, where was Mr. Neff?

"A: He was standing at the counter.

"Q: About how long was he there from the time you arrived?

"A: I would guess at two hours and a half.

"Q: During that time was he in jail?

"A: No sir.

"Q: Had you ever seen Mr. Neff before that day?

"A: No.

"Q: Never had any difficulty with him?

"A: No, I didn't even know the man. Don't know him yet only when I see him. .

"Q: When the case was tried on the 15th, was the city solicitor present?

"A: I am sure, sir, I don't know.

"Q: Who questioned you at the hearing?

"A: Well you might say—all I can recall I was asked by the Judge to make a statement as to the facts in the case, the size of the gun, etc., which I did.

"Q: Was the defendant represented by counsel?

"A: He was.

"Q: Who represented him?

"A: Mr. Winston Hill.

"Q: Did he question you?

"A: I don't think he did. I think he asked me where the gun was in the car.

"Q: And did you tell the Judge?

"A: Yes, I told him it was concealed under the driver's seat.

"Q: Under the seat?

"A: On the floor board under the seat.

"Q: Did you see the gun when you first looked in the car?

"A: No sir.

"Q: Was it a closed car?

"A: I don't know what you would call the car—wasn't a sedan—It was a sedan or coach.

## "CROSS-EXAMINATION

### "BY MR. HIRE:

"Q: You heard testimony this morning, Mr. Palmer, that the base upon which this seat in a '52 Hudson is suspended in the middle portion and goes clear to the floor and the seat overhangs not more than an inch. You know that?

"A: I know that it isn't the truth.

"Q: You are positive?

"A: I know that.

"Q: Now, isn't it a fact that you testified in municipal court that the gun was on the floor board of the Hudson automobile?

"A: I would call it the floor board.

"Q: And in under the seat as you told Mr. Junk over the telephone?

"A: On the floor board under the seat.

"Q: Was the entire portion of the gun, Mr. Palmer, say this is a seat of the automobile and I am looking directly down, could I have seen any portion of the gun?

"A: No.

"Q: How wide is this gun—about the width?

"A: Overall length between six and seven inches.

"Q: What is the shortest?

"A: I don't know.

"Q: Would it be three or four inches?

"A: I would not know.

"Q: Approximately?

"A: I don't know.

"Q: What do you estimate the overhanging portion of this seat?

"A: Sufficient to conceal the gun at the time.

"Q: What do you estimate the length in inches?

"A: I don't know.

"Q: You have some definite knowledge about some things?

"A: The gun was concealed when I found it.

"Q: Where was Mr. Neff when you found that gun?

"A: He was in front of the fruit stand—he was under the roof.

"* * *

"Q: Now, you stated, you explained some things to Mr. Junk. You heard Mr. Moore's testimony this morning that he told you he employed Dick Neff, that Dick Neff drove trucks and on this particular day he was going south, and he normally carried a gun. Did you report that fact to Mr. Junk?

"A: No.

"Q: When Mr. Junk called back, did you report that to him?

"A: No, I hadn't that information.

"Q: You had been told?

"A: No.

"Q: You heard his testimony?

"A: He is mistaken.

"Q: He never told you that he carried this gun on a truck this particular day?

"A: Yes, he told me that. He did not tell me before I had talked to Mr. Junk.

"Q: After you did learn of these facts, did you dismiss the affidavit?

"A: No, I did not.

"Q: How long after Dick Neff came up to the police station before you actually filed the affidavit?

"A: I don't know.

"Q: Would it have been an hour?

"A: It could have been.

"Q: More than an hour?

"A: It could be.

"Q: During that time when he first came up to the police station, isn't it a fact that both Mr. Moore and Mr. Neff told you that he carried this revolver with him on trips in the truck?

"A: They told me that. That is what they told me.

"Q: So you did know that?

"A: I did not know. I had their statements.

"Q: Statements of all three? Mr. Moore, Mr. Price Neff and Dick?

"A: That's right.

"Q: Do you consider Mr. Moore a reputable person?

"A: I do not judge anyone.

"Q: Well, you judged Dick Neff, didn't you?

"A: No, I left that for the Judge.

"Q: You did tell Dick Neff's father that you didn't give a damn about anybody's reputation?

"A: No.

"Q: The boy pleaded with you not to file that affidavit because of his reputation?

"A: I don't know whether he pleaded, but he told me he was concerned.

"Q: Didn't he ask you to please not file this affidavit?

"A: No, he didn't.

"Q: You didn't care anything about his reputation anyway, did you Mr. Palmer?

"A: I don't know what you mean.

"Q: Were you concerned in any manner?

"A: Yes, I was concerned to see that the facts were justified.

"Q: You didn't make any extensive investigation about the character of Dick Neff before you filed this affidavit?

"A: No, I did not.

"Q: As a matter of fact you made no investigation—didn't consult anyone about the reputation of Dick Neff in the community? Did you Mr. Palmer?

"A: I didn't know who to consult in a matter of that kind.

"Q: Now, isn't it a fact that Captain Haggard advised you that it was your decision to make whatever affidavit was filed. It was up to you?

"A: Captain Haggard stated to me that from what I had told him about the case, it was covered by law. That is what he told me.

"Q: Did Captain Haggard hear the statement of Mr. Moore that Dick Neff was employed by him and carried this gun for protection?

"A: I don't know what he heard.

"Q: Did you explain to Captain Haggard that he was carrying the gun for protection?

"A: I would say the Captain was aware of the facts.

"Q: Now, did you request the presence of the city solicitor in the trial of this matter, Mr. Palmer?

"A: I told the Chief of Police on a charge like that, the city solicitor should be there.

"Q: Did you ever request Mr. Junk personally?

"A: No, I did not.

"Q: Did you talk to Mr. Junk the morning of the hearing?

"A: I could have. He is in there at various times. In and out.

"Q: You would remember whether you had talked to him that morning, wouldn't you?

"A: Not necessarily.

"Q: Now, did Mr. Neff at any time tell you he had Bill Coil or the Coil boy with him shooting birds?

"A: That is what he told me.

"Q: Where?

"A: I wouldn't know. The Coil boy was in the car.

"Q: Where did that conversation take place?

"A: Down around the fruit stand.

"Q. Did Richard Neff state at that time when you were making up this accident report that the Coil boy had been with him prior to the accident?

"A: No, he simply said that he and the Coil boy were shooting crows.

"Q: Did he make any representation to you that the Coil boy was with him prior to the accident?

"A: Yes.

"Q: What was the statement?

"A: I ask him why he had a gun in the car and he said the Coil boy and he were firing it that morning.

"Q: Now did you tell Mr. Junk that Neff reported that he and the Coil boy were shooting birds with the gun?

"A: I told him that the man had this gun in his car.

"Q: Did you say anything about the Coil boy?

"A: I don't know whether I did or not.

"Q: Mr. Neff said words to the effect that you were 'stealing my gun.' What did he say?

"A: I don't recall the conversation.

"Q: You have left the inference that he accused you of stealing his gun. What did he say?

"A: I don't know exactly what he said.

"Q: You don't know then that there was any accusation against you stealing his gun?

"A: I haven't said there was.

"Q: Mr. Palmer, I think if the stenographer will read the question asked by Mr. Paxson—that you testified that Mr. Neff came back to the car and started talking to you with words to the effect that you were stealing his gun. What were words to that effect?

"A: I don't know there was any words to that effect.

"Q: What, if anything, did Dick Neff say to you?

"A: He said something about the gun. He was far away, and there was traffic out there.

"Q: You know what he said?

"A: I don't know exactly—something about the gun.

"Q: Did you have the gun in your pocket at any time?

"A: Yes.

"Q: When did you take it out of your pocket?

"A: Just as soon as he spoke.

"Q. Then you don't know whether Dick Neff said anything about your stealing the gun?

"A: I don't know whether he accused me of stealing the gun or not. I couldn't hear from that distance what he said, Mr. Hire.

"Q: I believe you testified that—you considered he was in the police station two and a half hours—Richard Neff. At no time was he free to leave the custody of yourself up to the time the bond was provided?

"A: That's correct.

"Q: And during that time the only person you talked with was the Captain of the Police Force, Harley Haggard, William Junk, the city solicitor, and the Chief of Police. Did you talk to the Chief of Police?

"A: I attempted to.

"Q: Did you?

"A: No.

"Q. What, if any part did he take in this arrest?

"A: He took no part in the arrest.

"Q: What, if any, part did he take after the arrest?

"A: None.

"THE COURT: There was some testimony that the Chief of Police had something to say about the amount of bond.

"A: As far as setting the bond.

"Q: So, he did to that effect say something about the matter?

"A: I didn't consider that any matter in the case.

"Q: Did he make the reduction of the bond from $500 to $200.

"A: I know it was reduced. I know that.

"Q: There has been testimony to the effect that you stated that you didn't know whether this would stick but you were going to try it?

"A: What do you mean?

"Q: After your conversation with Mr. Junk, did you make these statements to Richard Neff?

"A: I did not.

"Q: Did you make any statement similar to that?

"A: No. In fact I am always careful not to talk about these things before it goes to court.

"Q: You wanted to make it stick, didn't you Mr. Palmer?

"A: I had no interest whatsoever, only my duty as a police officer." And beginning at page 53 of the Record, we find the following testimony:—

"BY MR. PAXSON:

"Q: Please state your name to the court?

"A: Harley Haggard.

"Q: How old are you Mr. Haggard?

"A: 59.

"Q: You are a member of the police department of the city of Washington?

"A: Yes.

"Q: How long have you been on the police force?

"A: 23 years.

"Q: What is your official title?

"A: At the present time it is Captain.

"Q: Were you Captain in July, 1953?

"A: Yes sir.

"Q: Calling your attention to the afternoon'of July 13, 1953, you recall Mr. Palmer, who was then a Sergeant being sent to investigate an accident?

"A: Yes sir.

"Q: Were you in the police department when he returned?

"A: No, I was not.

"Q. Did you come in while he was there afterwards?

"A: I came in afterwards.

"Q: Who was present when you came in?

"A: Mr. Palmer and this gentleman here and I don't recall—Mr. Donald Moore.

"Q: Did Mr. Palmer make any statement to you about why he had brought Mr. Neff to the station?

"A: Yes sir, he did.

"Q: Tell the court what he said?

"A: He told me on investigation of this accident that he had found a gun on the floor board of this gentleman's car; that he brought him there and was going to charge him with carrying concealed weapons, and we checked up on certain section of law. I don't remember the number of the section. It was in regard to carrying concealed weapons, and as we interpreted it, I believe he had reason to arrest him for carrying concealed weapons, but if he had any doubt to call the city solicitor, Mr. Junk, which he did.

"Q: Did you hear the conversation between him and Mr. Junk?

"A: No. Once in a while I might hear something, but I went on with my other work and didn't pay strict attention. But I do remember when he finished talking to him, I asked him if I had advised him right on the section and he advised me that I had.

"Q: Now, did he then prepare the affidavit or do you know when the affidavit was prepared?

"A: Right at this minute I can't tell—whether it was he or myself.

"Q: Do you recall anything that Mr. Moore said?

"A: Well, the only thing that Mr. Moore was telling me that this was Mr. Neff and he was his employee. I told him 'Donald, that don't make any difference.' Total stranger to me. I did know his father, but I did not know this boy.

"Q: What was the amount of the bond fixed for his release?

"A: If I remember correctly, it was $500.

"Q: Was that amount furnished?

"A: Yes, Mr. Moore furnished it.

"Q: You don't remember whether the bond was reduced or not?

"A: That I don't know.

"Q: Were you present when the case was tried?

"A: No, I was not.

"BY MR. HIRE:

"Q: Do you remember Price Neff, father of Richard Lee Neff, of coming in the station?

"A: Later, yes.

"Q: Isn't it a fact that both Price Neff and Donald Moore made the statement and in your presence that the boy carried this revolver with him on trips after fruits and vegetables?

"A: I don't remember as to that statement. I remember he gave the reason for having it—he had been target practicing and throwed it on the floor board of the car.

"Q: Isn't it a fact that Price Neff, the father of the boy, came up and stated to Sergeant Palmer in your presence that he carried his revolver with him on trips to pick up fruit and vegetables, and Donald Moore confirmed that?

"A: I remember the father up there, but just what the conversation was, I can't tell you.

"Q: Were you there when bond was furnished?

"A: Yes.

"Q: Now, did the Chief of Police come downstairs at any time while you were there?

"A: Well, its been so long ago, I can't remember. Be hard to tell you who came in.

"Q: Now, don't you remember at any time Captain Haggard that Dick Neff told you and told Sergeant Palmer that he was employed by Donald Moore and that he carried large sums of money and used this revolver?

"A: After so long a time, he did make a remark about it.

"Q: And Donald Moore confirmed that?

"A: Yes, he did.

"* * *

"Q: Please state your name?

"A: R. L. Brubaker.

"Q: You are at present Probate Judge of Fayette County?

"A: That's correct.

"Q: In July of 1953 you were Judge of the Municipal Court of the city of Washington?

"A: That's correct.

"Q: Judge, calling your attention to July 15, 1953, ask you if you recall a case of the State of Ohio against Richard Lee Neff, that was tried in Municipal Court, charged with carrying concealed weapons?

"A: I don't recall the date. I recall the case. As to the exact date, I don't recall.

"Q. Recall whether the city solicitor was present?

"A. I don't recall.

"Q: Will you tell the Court what you do recall about it then?

"A: Well, I recall that the Defendant was found not guilty. My recollection of the testimony presented in that case was that the revolver was on the floor of the automobile, sticking out from under the seat at the time; and my feeling on it, therefore, was not concealed, and the defendant was not guilty of carrying concealed weapons.

"Q: Did the defendant testify in the case or did you make any inquiry?

"A: I don't recall. Might have been directed verdict. I don't recall.

"Q: You found him not guilty because you found there was no evidence that the gun was concealed?

"OBJECTION BY MR. HIRE.

"MR. PAXSON: I will withdraw the question.

"Q: Now, was Mr. Robert Palmer, the prosecuting witness in that case?

"A: I believe that is correct. Yes sir.

"Q: Ask you whether there was any evidence that led you to believe there was any malice by him against the defendant in the case?

"OBJECTION BY MR. HIRE.

"OBJECTION SUSTAINED. Exception noted.

"Q: In the presentation of the case by Mr. Palmer, what was his attitude?

"OBJECTION BY MR. HIRE.

"OBJECTION SUSTAINED. Exception noted.

"* * *

"BY MR. HIRE:

"Q: Judge Brubaker, was the examination conducted in your court, the Municipal Court, in the nature of a preliminary examination?

"A: As I recall that was a preliminary examination. If I might clarify, Mr. Paxson asked me several days ago about the case, and I told him I would check the docket because usually I would make notes concerning the testimony. I recall saying on the docket sheet that it was on preliminary examination but didn't find any notes.

"Q: You finding then under the law whether or not there was probable cause to bind over to the grand jury or lack of probable cause?

"A: I felt that under the evidence presented by the prosecuting witness that a jury. be required to find for the defendant. My theory on that is you should bind over unless the defendant would be entitled to a directed verdict.

"Q: In arriving at that conclusion did you take into consideration §13448-4 GC, which was in effect that time?

"A: No. As a matter of fact he had a right to have the weapon was not entered into.

"Q: At that time?

"A: No, it was strictly on the basis of whether it was concealed or not.

"Q: The evidence before you was the evidence of Sergeant Palmer of the Washington Police Department?

"A: As I recall he was the only one that testified.

"Q: I believe you stated you don't recall whether the city solicitor, William Junk, was present or not?

"A: I don't recall.

"Q: Was there any testimony adduced on behalf of the Defendant, in that case, Richard Neff?

"A: It is my recollection that the only evidence presented was by Sergeant Palmer, and that upon his testimony a dismissal was granted on the basis there wasn't sufficient evidence. I don't believe the defendant testified. I could be wrong on that.

"* * *

"BY MR. PAXSON:

"Q: Please state your name?

"A: William M. Junk.

"Q: Mr. Junk you are an attorney at law?

"A: Yes.

"Q: Practicing here in town?

"A: That's right.

"Q: You are also solicitor of the city of Washington?

"A: I am.

"Q: Were you city solicitor in July, 1953?

"A: I was.

"Q: Mr. Junk, you recall long about the 13th day of July, 1953, Mr. Robert Palmer calling you on the telephone in regard to a charge of carrying concealed weapons?

"A: I remember receiving a telephone call on or about that time. I don't recall the exact date, but I remember about that time I received a call.

"Q: Now can you tell us what Mr. Palmer said to you at that time?

"A: All I can do is to testify to the best of my recollection. As I remember Mr. Palmer called my office as is customary for police officers, and stated he had arrested a gentleman and was going to charge him with carrying concealed weapons and that the man had a gun in his car under the front seat. As I stated, and I believe to the best of my memory, asked about how he could phrase an affidavit charging him with carrying concealed weapons and that the man had a gun in his car under the front seat. As I stated, and I believe to the best of my memory, asked about how he could phrase an affidavit charging him with carrying concealed weapons.

"Q: Recall what you told him?

"A: As I recall, I told him I would have to do some checking on the statute and that I would call him back. As I remember I did do some

research work on it. I do remember calling him back and telling him that I had read the statute and to the best of my memory, I believe the state makes it a violation to carry concealed weapons about the person, and to the best of my memory, I told Sergeant Palmer that; I also read some annotations under that section, which there had been a conviction against a person for carrying a gun in a pocket on an automobile, which seemed to be similar to the facts that he had questioned me about; and that as I remember that was about the extent of the conversation.

"Q: Were you present when the case was tried?

"A: No. The next time I read about it in the newspaper.

"Q: Anyone asked you to attend the hearing?

"A: No, I had no further connection with it.

"Q: When are you usually called on a case?

"A: Only where there is a jury, and only upon special request of the Chief of Police or perhaps the trial judge.

"CROSS-EXAMINATION

"BY MR. HIRE:

"Q: Whenever the arresting officer requests that you attend, do you normally attend, William?

"A: Usually when an arresting officer makes a request of that nature, I will first advise them that I only appear where it is a contested case— where it is a plea of not guilty and when they actually retain counsel— those are only in case when I am actually requested.

"Q: In this case, as I gather from your testimony, the advice sought from you was mainly as to preparing the affidavit?

"A: That is correct.

"Q: The conclusion had been that the charge would be filed and your advice was sought?

"A: My advice was to the filing of the affidavit.

"Q: At any time did Mr. Palmer tell you that there had been representations made that the boy carried this revolver for protection and that he worked for Donald Moore and drove a truck to pick up fruits and vegetables and carried a large sum of money on him—that was the purpose of carrying the gun. Did Sergeant Palmer make that representation to you?

"A: If such was made, I don't recall it. I don't know whether we had any discussion about that.

"Q: Was the affidavit prepared under authority of §12819 GC?

"A: Was §12819 GC in effect in July of 1953?

"Q: Yes.

"A: To the best of my recollection, yes. Undoubtedly this is the section of law that I read at that time. I was looking at the annotations to see if it was the one I cited to Mr. Palmer.

"THE COURT: I have Page's annotated Code if you desire the witness to look at it.

"A: Sec. 12819 GC was undoubtedly the one I read since the annotations listed are the ones I remember. This case here 'A firearm carried in pocket of automobile door in driver's immediate proximity is con-

cealed about the person of the driver' I believe that is the case I perhaps cited. So it was undoubtedly that code section.

"Q: Calling your attention to §13448-4 GC, and if you will read that section Mr. Junk? (Reading) Was that section called to your attention by Sergeant Palmer?

"A: Not to my knowledge. I don't remember it being called to my attention.

"Q: Had it been called to your attention, would your advice been the same, Mr. Junk?

"A: Well, and again what facts were disclosed.

"Q: In this case the advice sought was merely how to form an affidavit?

"A: To the best of my memory that is all.

"MR. PAXSON: Defendant rests.

"DEFENDANT RESTS.

"AND BE IT FURTHER REMEMBERED, That the Plaintiff to further maintain the issues on his part to be maintained, offered and introduced in testimony on his behalf, the following evidence in rebuttal, to-wit:

"'* * *

"BY MR. HIRE:

"Q: Mr. Neff, state whether or not you told Officer Palmer that the Coil boy had been out shooting at birds with you?

"A: No sir.

"Q: Was the Coil boy out shooting at birds with you?

"A: No sir.

"Q: State whether or not you called or spoke to Officer Palmer at a distance of approximately from here to the railing of the court room, after coming out of Moore's Fruit Stand as to what he was doing with your gun?

"A: I asked him what he was doing with my gun.

"Q: Were you as far as I am here from the railing?

"A: Yes sir.

"Q: Were you that far?

"A: Yes sir, I was.

"Q: Did you at any time accuse Officer Palmer of stealing your gun?

"A: No sir.

"Q: Now, turning your attention to the police station, state whether or not in your presence, Officer Palmer made the statement 'I don't give a damn about your reputation'?

"A: He said that when my father said to him 'Do you realize what you are doing to him' and he said 'I don't give a damn about your reputation.'

"Q: State whether or not the Chief of Police Long at any time made any statement to Officer Palmer?

"A: The Chief of Police wasn't even in there. He may have talked to him.

"Q: Did you hear any conversation on the telephone as to the amount of the bond?

"A: No sir, there was several calls that came in the police station but I never heard the word 'bond' mentioned.

"Q: State whether or not you told Officer Palmer that you carried this particular gun with you on trips you made for Donald Moore?

"A: Those were the very words I told him.

## "CROSS-EXAMINATION

**"BY MR. PAXSON:**

"Q: You said you never heard the word 'bond' mentioned?

"A: Not on the telephone. It was mentioned in the police station, of course.

"Q: It was reduced from $500 to $200?

"A: Yes sir.

"MR. HIRE: Plaintiff Rests, your Honor.

"THE COURT: Any Sur-Rebuttal?

"MR. PAXSON: No." ·

The court finds from the testimony set forth above, as well as from the other testimony of record concerning defendant Palmer's acts and conduct while instituting and prosecuting said charge, that there is competent evidence of such credibility and weight that it shows and establishes legal malice sufficient to sustain plaintiff's action herein.

With regard to the essential element of absence of probable cause, this court is not unmindful that the law does not require a police officer to prove that a person was guilty of such offense in order to establish that the officer had probable cause for instituting such arrest and prosecution; for it is generally known and recognized that the process of the court, the evidence adduced by witnesses and the processes of the law may or may not convict a man.

In order to determine whether there was absence of probable cause in this case, the court has considered all of the conditions and circumstances shown by the credible evidence as to what was being done by plaintiff Neff and defendant Palmer, their conduct toward each other, what passed between them, what the defendant saw, the source and nature of information furnished to defendant concerning plaintiff's background, character and employment, and what was done by defendant in the light of such facts and circumstances.

In the case of **Ash v. Marlow, 20 Ohio 119**, decided by the Supreme Court of Ohio in 1851, it was held:

"1. 'A reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is Malicious Prosecution, Sec. 23, it is stated:

charged,' is a good definition of the term **'probable cause.'** "

In **25 O. Jur. 892**, under the heading "Want of Probable Cause,"

"The essential wrong in an action for malicious prosecution is that the proceedings complained of were without probable cause. Want of probable cause is one of the ingredients of the plaintiff's case, and one of the grounds of his action. The absence of reasonable and probable cause is of the real gist of the action, even though ·malice is also an essential element. · Therefore, it is the universal rule that to sustain

an action for malicious prosecution, a want of probable cause must be shown which must concur with malice; if the probability of the plaintiff's guilt appears to the defendant, whether there is malice or improper motive is immaterial. Want of probable cause must be shown irrespective of whether the prosecution is terminated by an acquittal of the accused, or a nolle prosequi. The question, is not one of the guilt or innocence of the plaintiff, but whether there existed a probable cause for the prosecution commenced against him by the defendant."

\* \* \*

In Sec. 24 thereof, it is stated:

"Probable cause is defined as a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.

"The courts quite generally agree that the question of probable cause is one of belief, founded on reasonable grounds. The belief of the defendant as to the plaintiff's guilt, if reasonable, is of the essence of the case upon the question of probable cause, since probable cause does not depend upon the actual state of the case, but upon the honest and reasonable belief of the party who is prosecuting. In one case, the court says that if the defendant entertained an honest belief that plaintiff had committed a violation of the law, and, acting on that belief, caused the prosecution to be instituted from a desire to bring a supposed public offender to justice, then he is not liable in an action for malicious prosecution. It would seem that the 'honest' belief must be founded on reasonable grounds."

In Sec. 25 thereof, it is stated:

"By probable cause is meant merely appearances which justified the defendant in thinking the plaintiff guilty. A groundless suspicion, unwarranted by the conduct of the accused, or by the facts known to the accuser, when the accusation is made, which would not be strong enough to warrant a cautious person in believing the accused guilty, is not sufficient. Moreover, the mere belief of the defendant that he had reasonable cause for prosecuting the plaintiff is not sufficient to show probable cause. It must be an honest and sincere belief, and must be based upon reasonable grounds. There must be something of reasonable certainty that will convince the ordinary mind of the guilt of the plaintiff —such circumstances and surrounding facts as would lead a person of ordinary prudence to believe in his guilt. When such facts exist, there is probable cause. The inquiry should be as to what the defendant knew or believed at the time and whether it was sufficient to sustain such a belief. The question to be determined is whether an ordinarily prudent person would have been led to believe from the facts that the plaintiff was guilty of the offense charged; if so, there was probable cause, otherwise not. It is only required that the defendant should act with reasonable prudence, but the case must be such as to justify an honest belief that the crime was committed, and that the plaintiff was guilty of it. Nevertheless, a person is not bound to have evidence which will insure a conviction, or absolutely convince him of the plaintiff's

guilt, but merely evidence sufficient to justify an honest belief in the guilt of the accused; or such circumstances must exist as would justify and warrant a reasonable, cautious, and prudent man in believing that the accused is guilty. When there is such information as will lead a reasonable, discreet, prudent, and intelligent man to believe the charge to be true, there is probable cause."

In Sec. 26 thereof, it is stated:

"In determining whether the defendant, in instituting the criminal proceeding, acted without probable cause, his conduct should be weighed in view of his situation at the time, and of the facts and circumstances which he knew, or was reasonably chargeable with knowing, when the proceedings were instituted. One has a right to act upon appearance, and if the apparent facts are such that a discreet and prudent person would be led to the belief that the offense charged had been committed by the accused, he is justified, although it turns out that he was deceived, and that the accused was innocent. The surroundings of the individual, exactly as they were at the time, and his belief in the facts charged, must be considered. If, from the information he then had, it was reasonable for him to rely upon those facts, he might institute the proceedings without further inquiry. But where a person instituting a prosecution omits to make such inquiry and investigation into the conduct of the accused as would have suggested itself to an ordinarily prudent person, and such investigation would have discovered that accused was not guilty of the offense, the prosecuting witness is not absolved of the ground of reasonable cause. **The defendant should be charged with every fact that he had knowledge of in relation to the plaintiff, and also with every fact with which he was reasonably chargeable with knowing in that connection.**

"Persons who are acting under excitement, or the necessity for haste, are not held to the same rule as that governing people who have time to deliberate the matter. Thus, an officer arresting upon view has no time to investigate the facts, if he would not lose his prisoner; he will, accordingly be held to a less degree of care in determining if there is probable cause." (Emphasis added by the Court.)

In Sec. 27 thereof, it is stated:

"Want of probable cause must ordinarily be affirmatively proved, and not inferred, even though it is a negative. It cannot be inferred from malice. **However, it may be inferred, when all the admitted circumstances surrounding the act for which the plaintiff was held to trial could not have led an ordinarily intelligent person to believe that he committed a crime.** If the charge or accusation is false, and the person making it had no reason to believe it true, there is a clear absence of probable cause. Want of probable cause may be still more clearly shown by the defendant's knowledge of the falsity of the charge, for good faith is an essential element of probable cause, although not its equivalent. Some things that are in the mind of the defendant, and influencing him, while too remote to be introduced to show the guilt of the plaintiff, are sometimes sufficient to form a probable cause, or a proper form of reasoning, such as persons of ordinarily prudent minds would be likely to form.

"* * *

"The plaintiff's reputation as a law-abiding and well-behaved person, and the defendant's knowledge of such circumstances, are facts to be considered on the question of reasonable or probable cause, if the defendant knew that the plaintiff's character and reputation for honesty was good. But if the defendant did not know, and could not have reasonably known, of this element when he instituted the proceeding, he should not be chargeable with it as a factor in determining whether or not he acted without probable cause." (Emphasis added by the Court.)

In Sec. 28 thereof, it is stated:

"Probable cause does not depend upon the fact of the guilt or innocence of the accused person, or. even upon the fact that a crime has been committed; the guilt or innocence of the accused is not the equivalent of probable cause, or the want thereof. **The guilt or innocence of the plaintiff is not involved, but only the question of the information had by the defendant, and whether he acted thereon as would any reasonable prudent man.**

"It is obvious that if the guilt of the plaintiff of the crime charged is established in an action for malicious prosecution, there is probable cause for the prosecution. Such guilt may be shown by a conviction in the criminal case, or a judgment against him in the civil case, which is the basis of the malicious prosecution. It may also be shown, notwithstanding his acquittal in the criminal case, or a judgment in his favor in the civil case.

"But the innocence of the plaintiff only tends to show want of probable cause. Although he is not guilty, there may be probable cause for his prosecution. Probable cause is distinct from the plaintiff's innocence, since the probability of guilt may appear, although there be innocence in fact." (Emphasis added by the Court.)

In Sec. 30 thereof, it is stated:

"The great weight of authority is to the effect that the mere fact of acquittal, upon the trial of one accused of crime, is not prima facie evidence of the want of probable cause for the prosecution, but there is authority to the contrary. In Ohio, it is held that the acquittal and discharge of the plaintiff does not negative probable cause, at least, not conclusively. His guilt may be shown, notwithstanding his acquittal in the former prosecution. In other words, the judicial establishment of the plaintiff's innocence does not at the same time prove that there was any want of probable cause for belief in his guilt when the prosecution was instituted. There may be probable cause in a case in which the defendant was not guilty of the offense charged, and of which he was acquitted, because there may be things known to the defendant which it would be entirely improper to introduce in evidence in the criminal prosecution, such, for example, as other instances in which the plaintiff committed the same offense. Therefore, although it turns out upon the trial that the plaintiff is not guilty, if the accuser at the time of making the charge believes him guilty upon reasonable grounds, he is not liable for instituting the prosecution."

* * *

In Sec. 32 thereof, it is stated:

"A distinction is made, in the showing of probable cause, between a mere binding over by a committing magistrate, and an actual conviction of the accused party. In the latter case, as has been shown, conviction will generally be held conclusive as to probable cause, in the absence of a showing that it was procured by fraud or false testimony. But the finding of a committing magistrate that an offense has been committed, and that there is probable cause to believe the defendant guilty thereof, is generally held only prima facie, and not conclusive, evidence of probable cause, in an action for malicious prosecution brought against the complaining witness by the defendant after his discharge. In Ohio, also, it is held that the action of the examining magistrate in binding the plaintiff over for trial does not, of itself, constitute probable cause, as the presumption of probable cause arising from such a fact is not conclusive, but that it does prima facie establish probable cause.

"**On the other hand, the weight of authority is that a discharge by an examining magistrate is prima facie evidence that there is want of probable cause for the prosecution.** There is a clear distinction between such a discharge and an acquittal by a jury. It would be the duty of the jury to acquit the defendant if on all the evidence there was a reasonable doubt of his guilt, even though they might believe he was probably guilty of the crime. But the magistrate would violate his duty if he discharged the accused when the evidence produced the belief that he was probably guilty of the crime. **He acts directly upon the question whether there is a probable cause for the prosecution; if he discharges him, it must be because, in his judgment, there is no probable cause for the prosecution. In Ohio, it is also held that, while want of probable cause is not shown by the mere acquittal and discharge of the plaintiff by the examining magistrate alone, at least, not conclusively, it is prima facie established thereby;** very slight circumstances, in addition to this, will show the existence of this necessary element."

And, in Sec. 33 thereof, it is stated:

"The authorities do not agree as to whether the advice of counsel establishes probable cause. Some jurisdictions hold that it is a circumstance tending to show the existence of probable cause. In Ohio, it is held that probable cause may be shown or indicated by[1] the fact that the defendant sought and relied on the advice of counsel before suing out his affidavit charging the plaintiff with an offense. One may act in reliance upon the advice of counsel in bringing· or instituting an action, as in such a case he has a probable cause for the prosecution of such an action. The fact that a policeman, after arresting the plaintiff on view, consulted the police prosecutor, and relied upon his advice in bringing the formal charge against the plaintiff, points to the existence of probable cause.

"**It is generally held that the advice of an attorney at law, in order to constitute conclusive proof of the presence of probable cause, must have been given after a full and fair statement to the attorney of all the facts, and want of probable cause may be inferred when it appears that the defendant did not acquaint his attorney with all the facts of the case. * * ***" (Emphasis added by the Court.)

With regard to the last paragraph quoted above, it is noted that the Supreme Court of Ohio, in Ash v. Marlow, supra, laid down the following rule of law in paragraph 4 of the syllabus thereto:

"If the defendant, in an action for malicious prosecution, would take shelter under the 'advice of counsel,' he must be prepared to show that he communicated to such counsel all the facts bearing upon the guilt or innocence of the accused, of which he had knowledge, or by reasonable diligence could have ascertained."

In applying the rules of law, above quoted and referred to, to the testimony of record in this case, this court finds from all of the evidence adduced:

(a) That said revolver was not concealed on the floor under the front seat of plaintiff's automobile;

(b) That defendant Palmer did not communicate and give to said City Solicitor a full and fair statement of all the facts of which said defendant had knowledge or by reasonable diligence could have ascertained;

(c) That, in said telephone conversation with the City Solicitor, defendant Palmer represented that he had arrested the plaintiff "and was going to charge him with carrying concealed weapons and that the man" (plaintiff) "had a gun in his car under the front seat"; and that said defendant "asked about how he could phrase an affidavit charging him" (plaintiff) "with carrying concealed weapons";

(d) That the advice which defendant Palmer sought from the City Solicitor by said telephone conversations "was mainly as to preparing the affidavit";

(e) That the advice so sought by defendant Palmer "was merely how to form an affidavit";

(f) That the facts and circumstances which were shown to be within the knowledge of defendant Palmer, at the time of instituting and prosecuting said charge, clearly showed that said defendant instituted and prosecuted said charge without sufficient evidence to justify an honest belief in the guilt of the plaintiff;

(g) That the facts and circumstances which were shown to exist at the time of instituting and prosecuting said charge would not have justified and warranted a reasonably cautious and prudent man in believing that plaintiff was guilty of such charge; and

(h) That defendant Palmer instituted and prosecuted said charge without probable cause.

With regard to the measure of damages to be used in determining what, if any amount, plaintiff is entitled to recover in this action, the rules of law applicable thereto have been stated as follows:

"Damages for malicious prosecution are not limited to special damages, but the jury may allow, as general damages, such damages as naturally flow from the act done, such as mental suffering, indignity, and humiliation, and such damages as will provide remuneration for mortification, humiliation, and shame and anguish of mind suffered by reason of arrest and imprisonment, and compensate for the injury done to character, reputation, and credit by the prosecution. The jury may

also assess a reasonable amount for the value of time consumed in making defense to the prosecution." (25 O. Jur., Malicious Prosecution, Sec. 78, pages 953 and 954.)

Undisputed testimony in this case shows that plaintiff was earning from $65 to $140 per week at the time defendant instituted and prosecuted said charge; that plaintiff's earnings in excess of $65 per week were dependent upon the frequency and extent of trucking-trips made by plaintiff to points outside of Ohio for the purpose of purchasing and returning with fruits and vegetables for his employer; that, subsequent to the termination of said prosecution on said charge, plaintiff was not employed to make such trips for his employer; that from about September 1, 1953 to November 1, 1953, his employer, Mr. Moore, employed him on a part time basis and, on or about November 1, 1953, completely terminated plaintiff's employment due to the bad publicity arising out of said prosecution and some pressure on the part of Mr. Moore's family; that plaintiff was out of employment for two months thereafter; that plaintiff was afraid to seek employment in Washington C. H., Ohio, because those he interviewed for employment asked about said prosecution; that plaintiff finally secured employment in Columbus, Ohio; and that plaintiff has since remained employed by an out of town concern. It is also undisputed that plaintiff paid an attorney $50 to defend him in said prosecution in the Municipal Court.

In applying the rules of law, above quoted and referred to with respect to the measure of damages, to the aforesaid undisputed testimony of record herein, this court finds from all of the evidence adduced that plaintiff sustained damage in the abount of $1,000.00 and for which judgment should be rendered against the defendants, Robert C. Palmer and The Ohio Casualty Company, together with the court costs incurred in the prosecution of this action.

Counsel for plaintiff should prepare an entry accordingly with appropriate exceptions therein noted, and submit same to counsel for defendants and to this Court for approval by on or before January 30, 1956.